**UNITED STATES BANKRUPTCY COURT**          <u>**NOT FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

In re:                                                                                  Chapter 11

8 WEST 58TH STREET HOSPITALITY, LLC          Case No. 14-11524 (SHL)

                Debtor.

-----------------------------------------------------------------x

**MEMORANDUM OF DECISION GRANTING**
**THE DEBTOR'S FUNDING AGREEMENT MOTION**

**A P P E A R A N C E S :**

**GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP**
*Counsel to 8 West 58th Street Hospitality, LLC*
1501 Broadway, 22nd Floor
New York, New York 10036
By:    Kevin J. Nash, Esq.
        J. Ted Donovan, Esq.

**TROUTMAN SANDERS LLP**
*Counsel to 14 East 58th LLC*
875 Third Avenue
New York, New York 10022
By:    Brett D. Goodman, Esq.

**PICK & ZABICKI LLP**
*Counsel to Be My Guest, LLC*
369 Lexington Avenue, 12th Floor
New York, New York 10017
By:    Douglas J. Pick, Esq.
        Eric C. Zabicki, Esq.

**LAW OFFICES OF LAWRENCE M. GORDON**
*Counsel to Nello Balan and Lucy Balan*
300 Garden City Plaza, Suite 450
Garden City, New York 11530
By:    Lawrence M. Gordon, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

        Before the Court is the Debtor's motion to approve a funding agreement between the

Debtor and 14 East 58th LLC (the "Agreement") pursuant to Sections 363 and 364 of the

Bankruptcy Code (the "Motion").  [*See* ECF No. 196].  If approved, the Agreement will provide

funding for the Debtor's exit from Chapter 11 after more than three tumultuous years.  The

Motion is opposed by Be My Guest, LLC ("BMG").  [*See* ECF No. 201].  A hearing to consider

this Motion was held on July 11, 2017 (the "July 11th Hearing").  *See* Transcript of Hearing

Held on July 11, 2017 ("Hr'g Tr.") [ECF No. 208].  For the reasons that follow, the Court

approves the Motion.

## BACKGROUND

It is impossible to understand the current Motion absent a brief overview of this case's

unfortunate history.  The Debtor was formed in February 2012 to develop and operate a

restaurant.  *See In re 8 W. 58th St. Hospitality, LLC*, 2015 WL 9311525, at *1 (Bankr. S.D.N.Y.

Dec. 21, 2015) ("*8 West* I).  To that end, the Debtor entered into a lease agreement (the "Lease")

in August 2012 for the premises located at 14 East 58th Street, New York, New York with a

lessor that subsequently assigned its rights to 14 East 58th LLC (the "Landlord").  *See id.*  The

Debtor defaulted under the payment terms of the Lease and subsequently filed for Chapter 11 in

May 2014.  *See id.*  Although the restaurant was not successful, the Lease retains significant

value, with a term that runs through August 2028.  *See* Lease, attached as Exh. B to the Motion;

*see also* Motion ¶ 6.  The Lease is also the Debtor's only real asset.

The Debtor's principal, Max Burgio, entered into negotiations with an individual named

Nello Balan about the Debtor's exit from Chapter 11.  *See 8 West* I, 2015 WL 9311525, at *1.

Ultimately, a new investor group was formed consisting of Nello Balan, his daughter Lucy

Balan, and Oswaldo Karam.  *See id.*  The Balans and Mr. Karam organized BMG to acquire the

Lease and related assets in exchange for curing all Lease arrears, plus paying additional sums

over time to various creditor constituencies and equity interest holders.  *See id.* at *1–2.  These

2

funding commitments were contained in letter agreements, the final terms of which were set forth on the record at a hearing to consider the Debtor's motion to assume and assign the Lease to BMG. *See id.* at *1–2. In November 2014, an order was entered approving the assumption and assignment of the Lease to BMG (the "Approval Order"). *See id.* at *2.

Apparently having second thoughts about its agreement with the Debtor, BMG did not honor its obligations under the Approval Order. *See id.* In July 2015, BMG ultimately sought relief from the Approval Order under Federal Rule of Civil Procedure 60(b)(1) and (6). [*See* ECF No. 68]. The Debtor moved to compel compliance with the Approval Order. [*See* ECF No. 76]. The Court denied BMG's request. *See 8 West* I, 2015 WL 9311525, at *6. At the same time, the Court granted the Debtor's motion to compel BMG's compliance with the Approval Order and required BMG and Nello Balan and/or Lucy Balan to execute confessions of judgment as required by the Approval Order. *See id.*[1]

In March 2016, a year and a half after the Approval Order was entered, the Balans and BMG still had not complied with their funding obligations. [*See* ECF No. 111]. The Debtor moved for an order of contempt against BMG and the Balans. [*See* ECF No. 116]. The Court granted the Debtor's motion and found BMG and Nello Balan in civil contempt (the "April 2016 Contempt Order"). [*See* ECF No. 129]. The April 2016 Contempt Order provided that if BMG and Mr. Balan did not comply with their obligations, they would be subject to a penalty of $500 per day computed on a *pro rata* basis—80% to BMG and 20% to Mr. Balan. *Id.* ¶ 5.

BMG still did not make the required payments. In December 2016, the Debtor moved for civil contempt against the Balans and Mr. Karam as principals of BMG, an order of incarceration

---

[1]    BMG appealed that order. After separate motions to this Court and the District Court for a stay pending appeal were denied, the appeal was withdrawn in March 2016 by stipulation filed in the District Court. *See In re 8 W. 58th St. Hospitality, LLC*, 2016 WL 856800 (Bankr. S.D.N.Y. Mar. 4, 2016) (*8 West* II); Stipulation to Dismissal of Bankruptcy Appeal Pursuant to Fed. R. Bankr. P. 8023 [ECF No. 128].

against Nello Balan, and a separate finding of civil contempt against Lucy Balan for failing to

execute and deliver a confession of judgment as required by the prior Court order (the

"Contempt Motion"). [*See* ECF No. 166]. The Court found Mr. Karam in civil contempt as a

controlling person of BMG given BMG's failure to comply with the Court's prior orders. *See*

Order Regarding Contempt and Further Proceedings (the "March 2017 Contempt Order") ¶ 4

[ECF No. 189]. The Court did not rule on the Debtor's other requests but adjourned them for an

evidentiary hearing to be determined at a future date. *See id.* ¶¶ 1–3.

Meanwhile, the Debtor moved for the surrender and return of the Lease and related

operating assets from BMG to the Debtor given BMG's failure to honor its obligations to pay for

the Lease (the "Surrender Motion"). [*See* ECF No. 176]. Due to BMG's own bankruptcy filed

on March 22, 2017, the Court has not yet ruled on the Surrender Motion. *See* March 2017

Contempt Order ¶ 6.

As this case has dragged on, the Landlord has voiced increasing frustration with the lack

of progress and continued uncertainty over who will occupy the premises. More recently, the

Landlord has expressed an interest in seeking a return of the Lease as part of a resolution of this

case. Consistent with that idea, the Debtor and the Landlord entered into this Agreement at the

end of May 2017. The Agreement provides that the Debtor will continue its litigation against

BMG and its principals by pursuing the Contempt and Surrender Motions, as well as any

additional motions related to the Approval Order and the Lease. *See* Agreement ¶¶ 1–2, attached

as Exh. A to the Motion. If the litigation is successful—meaning the Lease is returned to the

Debtor's estate—the Debtor will sell the Lease to the Landlord for $1,250,000. *See id.* ¶ 3.

However, if the litigation is unsuccessful, the Debtor and Mr. Burgio will assign their claims

against BMG and its principals to the Landlord, including the proof of claim and all contempt

penalties, in return for $1,000,000. *See id.* ¶ 7. Thus, the Agreement sets a floor recovery to the

Debtor of $1,000,000. While the litigation is pending, the Landlord will pay all of the Debtor's

legal fees and expenses related to the litigation with BMG, including quarterly fees to the Office

of the United States Trustee. *See id.* ¶ 5. Additionally, the Landlord indemnifies the Debtor and

Mr. Burgio from any claims asserted by BMG or its principals in connection with the litigation.

*See id.* ¶ 4.

Under the Agreement, the Landlord has the right to copies of all motions, objections,

pleadings or other court filings of the Debtor prior to their being filed with any court. *See id.* ¶ 9.

Additionally, while the Agreement states that the Debtor will not enter into any settlement with

BMG and/or BMG's principals in connection with the litigation prior to receiving the Landlord's

written consent, the Debtor is not precluded from presenting such a settlement to the Court for

approval. *See id.* ¶¶ 9–10. Rather, if the Debtor settles with BMG and its principals and the

Lease is not returned to the Debtor, all the settlement proceeds above $1,000,000 shall be paid to

the Landlord and will not be deemed property of the Debtor's estate. *See id.* ¶ 10.

Finally, the Agreement requires the Debtor to cooperate with the Landlord and use

commercially reasonable efforts in connection with the litigation and failure to do so is grounds

for the Landlord to declare a breach of the Agreement. *See id.* ¶ 6.

## DISCUSSION

### A. The Business Judgment Standard

Section 363(b) of the Bankruptcy Code governs the proposed use or sale of estate

property outside of the ordinary course of business. *See* 11 U.S.C. § 363. The standard for

approval under Section 363(b) is whether the debtor exercised sound business judgment. *See In*

*re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *see also In re Borders Grp.,*

*Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011). The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted). The case law under Section 363 provides that "[t]he business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (quoting *In re Integrated Res., Inc.*, 147 B.R. at 656). "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence . . . [and] will uphold the board's decisions as long as they are attributable to any rational business purpose . . . Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *Id.* (citation omitted).

## B.  The Agreement is Within the Debtor's Business Judgment

The Court finds that entering into the Agreement is well within the Debtor's business judgment. The benefits of the Agreement are numerous. First and foremost, it adds significant value to the Debtor's estate with a guaranteed monetary value of $1,000,000 for the estate. Second, it offers an indemnification provision, under which the Landlord indemnifies the Debtor and Mr. Burgio from any claims asserted by BMG or its principals in connection with the litigation. *See* Agreement ¶ 4. Specifically, the Landlord agrees to "indemnify the Debtor, the Debtor's estate, and Burgio, from any and all claims, demands, suits or causes of action, asserted

6

by BMG and/or the BMG Principals, against the Debtor, the Debtor's estate, or Burgio, arising out of, or in connection, with the Litigation." *Id.* Even if the Debtor is unsuccessful in its litigation against BMG, therefore, the Debtor still has a guaranteed recovery of $1,000,000 in consideration for the "sale and transfer of all right, title and interest of Debtor and/or Burgio in and to all claims against BMG and the BMG Principals, including the filed Proof of Claim plus continuing contempt penalties." *Id.* ¶ 7.  The Debtor explained that this indemnification provision was critical and described the Agreement as essentially an insurance policy by providing funding and protection to the Debtor.  *See* Hr'g Tr. 19:1–9, 20:1–3.  This indemnification provision is extremely valuable to the Debtor's estate because it places the risk and cost of litigation on the Landlord rather than on the Debtor, a very important benefit in a bankruptcy case plagued by ongoing litigation.  Relatedly, the Landlord also will pay the Debtor's "reasonable attorney's fees and expenses to prosecute the [l]itigation" with BMG. Agreement ¶ 5.  This will greatly benefit the Debtor's creditors because the Debtor's legal fees will no longer be borne by the estate as an administrative expense.  Without these indemnification and fee provisions, the risk of future litigation threatens to rob creditors in this case of a meaningful recovery, or any recovery at all.[2]

BMG raises several objections to the Motion.  None have merit.  First, BMG questions the benefits to the Debtor under the Agreement as compared with offers made by BMG to the Debtor.  But the Landlord's deal is simply better than what BMG has to offer.  At the July 11th Hearing, BMG stated it could pay $800,000 to the Debtor.  *See* Hr'g Tr. 37:5–7, 48:25–49:3. Thus, the Agreement is more valuable by at the least $200,000.  Under the Agreement, the floor for recovery by the Debtor is $1,000,000, with the possibility of receiving $1,250,000.

---

[2]    In reaching its decision to approve the Agreement, the Court also concludes that the parties have exercised good faith in entering into the Agreement as evidenced by the benefits received by each side.

As part of its argument that it is offering better value to the Debtor, BMG refers to a supposed settlement that it made with the Debtor at a prior hearing in April 2017. *See* Objection ¶ 2. BMG apparently offered to pay $500,000, with an additional $500,000 paid over time to be secured by a letter of credit. *See id.* ¶ 2 n.1; *see also* Hr'g Tr. 64:13–18. BMG suggests that it had reached a settlement with the Debtor on these terms, implying that the Court should enforce this settlement. *See* Objection ¶¶ 2–3. But BMG's characterization is not supported by the record. No motion to approve a settlement between the Debtor and BMG was ever presented to the Court. No payment from BMG to the Debtor was ever made. Moreover, BMG's contention that the Debtor accepted its offer at the April 2017 hearing is belied by the record. At that hearing, Debtor's counsel stated that he had received offers from both BMG and the Landlord and would need to consider them and speak with the interested parties on the Debtor's side. *See* Transcript of Hearing Held on April 27, 2017 at 9:16–22, 10:5–10, attached as Exh. A to Debtor's Response to Objection ("Reply") [ECF No. 204]; *see also* Hr'g Tr. 21:25–22:10 (rejecting notion that any agreement had been reached between the Debtor and BMG at the April 2017 hearing). Indeed, BMG's own counsel conceded that Debtor's counsel had stated that he needed to get Mr. Burgio's consent to the settlement, a statement that demonstrates that no agreement was reached. *See* Hr'g Tr. 36:16–17 (stating "Mr. Nash said he had to go to Mr. Burglio [sic] and get Mr. Burglio's [sic] consent to the settlement."). Instead, the parties' discussions should more accurately be characterized as negotiations.

In any event, the Debtor has cogently explained why the terms of BMG's supposed "settlement" are inferior to the Agreement. BMG's settlement offer provided for approximately $500,000 payable in 60 days from April 27, 2017 or entry of a final order approving the settlement, and then $500,000 paid over a period of ten months with payments beginning in

September 2017.  *See* Objection ¶ 2 n.1.  Given BMG's abysmal track record in failing to honor

its obligations in this case, however, the Debtor is justified in being extremely suspicious of any

offer by BMG of payment in the future, particularly payments to be made incrementally.  Indeed,

there is a legitimate concern about being able to hold BMG to the terms of any agreement to pay.

As has been demonstrated by the civil contempt proceeding, BMG has taken steps to make itself

judgment proof.  According to BMG's own filings, BMG and the Balans have no assets or

income.  *See, e.g.*, BMG's Opposition to Contempt Motion ¶¶ 3–6 [ECF No. 170]; [ECF Nos.

171, 172, 173] (declarations stating that neither BMG, nor the Balans have the financial ability to

satisfy amounts at issue); Hr'g Tr. 48:6–11 (BMG's counsel stating BMG and Balans have no

money).  Rather, it appears that BMG's *de facto* controlling party Oswaldo Karam—a foreign

citizen presumably outside of this Court's jurisdiction—decides what obligations he wishes to

pay on behalf of BMG and what obligations he does not.  *See, e.g.*, March 2017 Contempt Order

¶ 4; Transcript of Hearing Held on February 6, 2017, at 6:1–10 [ECF No. 186] (finding Mr.

Karam in civil contempt for BMG's failure to honor its obligations); Transcript of Hearing Held

on March 1, 2017, at 7:15–24 [ECF No. 190] (Court observing it has been informed by BMG's

counsel that BMG is essentially judgment proof and is a shell to be funded when it needs to be

by Mr. Karam); Hr'g Tr. 44:16–22 (Court stating "you've come to Court to tell me that anybody

in BMG or associated with BMG is essentially asset-less and judgment-proof, and BMG only

gets funded when it wants to do something like pay its rent . . . which it does while not honoring

its other obligations.").  In light of all these circumstances, BMG's offer is rife with concerns.

But even taking its terms at face value, the Agreement is still a better deal since it is $1,000,000

in one payment—with the possibility of more—as compared with BMG's proposal to pay over

time.

The Court is mindful that BMG has just filed a motion to seek an order authorizing it to deposit funds with the Court Registry pending a determination on BMG's motion to purge the civil contempt orders.[3] However, the filing of that motion does not alter the Court's conclusion here. As a technical matter, of course, BMG's contempt remains outstanding.[4] Moreover, the Agreement remains a better deal for the Debtor for the same reasons stated above: the $1,000,000 payment under the Agreement—together with the Agreement's other provisions—is better than the $800,000 that BMG proposes to pay. *See* Hr'g Tr. 16:9–20 (Debtor explaining that if BMG purged its contempt to the Court's satisfaction and BMG does not have to surrender the premises, BMG would retain the premises and under the Agreement the Debtor would still get $1,000,000).[5] While there was a time back in 2014 when BMG's deal was the only offer in town, that is no longer true now. The Debtor is obliged to consider the Landlord's proposal as part of its ongoing obligation to maximize value for its estate. *See In re Fin. News Network Inc.*, 980 F.2d 165, 169 (2d Cir. 1992) (noting bankruptcy court's responsibility to ensure the enhancement of value of debtor's estate); *cf. Krys v. Farnum Place, LLC* (*In re Fairfield Sentry Ltd.*), 768 F.3d 239, 246–47 (2d Cir. 2014) (in the Chapter 15 context, the bankruptcy court was required to conduct a Section 363 review of a sale approved by a foreign court and noting that bankruptcy courts "have broad discretion and flexibility. . . to enhance the value of the estates

---

[3]     By letter dated July 19, 2017, BMG requested authorization for Gaby, LLC to deposit $800,000 with the Court Registry pending the hearing and determination of its motion to purge contempt. *See* Letter Dated July 19, 2017 [ECF No. 207]. Given BMG's own Chapter 11 filing, the Court instructed BMG to seek such relief by motion in its own bankruptcy case, on notice to creditors. *See id.* BMG filed such a motion on July 28, 2017. [*See* Case No. 17-10692, ECF No. 54].

[4]     Notably, nothing in the Agreement prevents BMG from purging its contempt. *See* Hr'g Tr. 15:13–19 (stating the Agreement does not preclude BMG from purging contempt).

[5]     BMG's latest motion seeking to purge contempt is not currently before the Court. But BMG contends that if it purges its contempt, then the Surrender and Contempt Motions are moot. *See* Hr'g Tr. 50:22–25. While that argument will be addressed in future proceedings, the Court rejects BMG's motion to purge contempt to the extent that it seeks to derail the Motion currently before the Court.

10

before it," and that the court's "principal responsibility . . . is to secure for the benefit of

creditors the best possible bid," which requires looking at all "salient factors pertaining to the

proceeding" including for example, an asset's increase in value) (citations omitted).

BMG cannot fail to honor its obligations for years, force the Debtor to seek out other

options, and then seek to preclude the Debtor from pursuing those options by agreeing to comply

with the original agreement at the very last moment. For the last three years, BMG has held the

keys to the Debtor's exit from what should have been a simple Chapter 11 case. *See* Hr'g Tr.

18:4–7 (Debtor stating it is cognizant that without BMG it did not have a confirmable plan and

that it cannot wait any longer). But BMG failed to honor its payment obligations and has

repeatedly flouted Court orders. *See* April 2016 Contempt Order; March 2017 Contempt Order.

BMG cannot now seek to negotiate away its contempt and handcuff the Debtor in the process.

That is not how contempt works. *See Midlarsky v. D'Urso*, 519 N.Y.S.2d 724, 725 (App. Div.

2d Dep't 1987) ("The court is vested with broad discretion in determining appropriate conditions

upon which a contemnor may purge the contempt."); *cf. Ngang Gung Rest. v. Official Comm. of

Unsecured Creditors of Ngang Gung Rest.* (*In re Ngang Gung Rest.*), 1996 U.S. Dist. LEXIS

18877, at *13 (S.D.N.Y. Dec. 20, 1996) ("To the extent that a civil contempt order is coercive, it

can be avoided through obedience to the order.").

BMG raises several other objections to the Agreement. For example, BMG argues that

the Agreement requires the Debtor to cede control of the case to the Landlord. *See* Objection ¶

4. Specifically, BMG cites paragraph nine of the Agreement that addresses the Debtor's ability

to settle with BMG. *See* Hr'g Tr. 39:6–21. That paragraph states that the Debtor agrees to

refrain from entering into any settlement agreement with BMG or its principals in connection

with the litigation without first receiving the written consent of the Landlord. *See* Agreement ¶

11

9.  At the July 11th Hearing, however, the Debtor and the Landlord explained that paragraph

nine was to be read in conjunction with paragraph 10, which contemplates a situation where the

Landlord does not consent to a settlement between the Debtor and BMG.  *See* Hr'g Tr. 53:13–21.

The Debtor sees these two paragraphs together as not requiring it to obtain the Landlord's

consent before entering into a settlement with BMG, but rather providing the Landlord with the

right to review and comment on any proposed settlements.  *See* Hr'g Tr. 22:25–23:6, 23:12–17

(explaining Debtor can settle even without Landlord's consent and what happens if that occurs);

*id.* 26:1–8 (Landlord's counsel confirming Agreement gives Landlord the right to comment but

does not require its consent).  At the July 11th Hearing, Debtor's counsel agreed that the

language in the Agreement should be modified to clarify the parties' intent that the Landlord

does not have veto power over any potential settlement with BMG.  *See* Hr'g Tr. 53:13–17

(agreeing with the Court that paragraph nine should be modified to make clear it is subject to

paragraph 10(ii)).  Of course, any such settlement also would be subject to Court approval.  On a

related point, the Court also rejects BMG's claim that the fact that the Landlord may declare a

breach of the Agreement somehow means that the Landlord will control the case.  *See*

Agreement ¶ 6.  Even if there is a breach, the $1,000,000 payment to the estate is preserved.  *See*

*id.*; Hr'g Tr. 57:3–14 (explaining effect of a breach that is not cured).

　　　BMG also complains that the Agreement will not end the Debtor's involvement in

litigation.  *See* Objection ¶ 4.  But the Court notes that the Debtor's litigation against BMG only

became necessary because of BMG's failure to honor its obligations.  BMG cannot now leverage

this litigation to its benefit.[6]  BMG entered into an agreement to fund the Debtor's plan and it

---

[6]      The Court is troubled by BMG's own Chapter 11 filing.  *See In re Be My Guest, LLC*, Case No. 17-10692.
BMG concedes that it filed for Chapter 11 in part to deal with the Lease.  *See* Aff. Pursuant to Local Bankr. R. 1007-
2 ¶ 10 [Case No. 17-10692, ECF No. 6].  Indeed, its bankruptcy was filed on the eve of the hearing on the Debtor's
Surrender Motion, which was filed only because BMG was in contempt of its obligation to pay the Debtor for the

failed to honor its obligations thereby forcing the Debtor to seek alternatives. Now, BMG is essentially seeking veto power over any other source of funding by virtue of its earlier (unfulfilled) commitment to pay the Debtor for the Lease. The Court will not condone BMG's gamesmanship or reward its contempt.[7]

BMG also insists the Agreement is a financing transaction subject to Section 364 of the Bankruptcy Code. *See id.* Admittedly, the Debtor moved for approval of the agreement under both Sections 363 and 364, but stated that it did so under Section 364 out of an abundance of caution. *See* Reply ¶ 24; *see also* Hr'g Tr. 13:17–14:5. As explained by the Debtor and made clear from the terms of the Agreement, the funding is not a loan. The Agreement does not provide an applicable interest rate, terms of repayment, or events of default. *See* Agreement. Rather, it is an agreement for the Landlord to serve as the source of funds for the Debtor's exit from bankruptcy. Indeed, it is not all that different in many ways from the agreement the Debtor originally reached with BMG; both essentially seek to convey the Lease to a non-debtor third party in exchange for a payment that will be used to pay creditors. The Debtor's original agreement with BMG was not presented to the Court as a financing transaction under Section 364, nor should it have been. For all these reasons, the Court rejects the characterization of the Agreement as a financing transaction and finds it is not subject to the requirements of Section 364. *Cf. In re Ashford Hotels, Ltd.*, 226 B.R. 797, 801–02 (S.D.N.Y. 1998) (noting Section 364

---

Lease. *Cf. C-TC 9th Ave. P'ship v. Norton Co.* (*In re C-TC 9th Ave. P'ship*), 113 F.3d 1304, 1311–12 (2d Cir. 1997) (setting forth factors to consider whether a filing was in bad faith).

[7]        Contrary to BMG's arguments, the Debtor is not risking litigation under the Agreement. *See* Hr'g Tr. 38:21–39:4 (BMG characterizing the Agreement as including a risk of litigation). Rather, under the Agreement, the Landlord will pay the Debtor's legal fees and expenses related to litigation with BMG, plus quarterly fees to the United States Trustee. *See* Agreement ¶ 5.

13

did not truly fit Chapter 7 trustee's motion for approval of a funding agreement and instead

analyzed the agreement as if it was a settlement under Bankruptcy Rule 9019).[8]

BMG further argues that it is improper for the Landlord to pay the Debtor's legal fees and

that the Agreement presents a conflict of interest for Debtor's counsel. *See* Objection ¶ 4. This

relates to BMG's control argument but, as previously noted, there is no evidence that the

Landlord will gain control of the case. The Debtor contends that BMG's argument is ironic

given that the initial funding agreement between the Debtor and BMG included a commitment

for BMG to pay a portion of the Debtor's legal fees. *See* Reply ¶ 26.

Tellingly, the United States Trustee, which has played an active role in this case, does not

object to the Agreement. *See* Hr'g Tr. 29:6–9. This is likely because the arrangement satisfies

the factors set forth in *In re Lar Dan Enterprises, Inc.*, 221 B.R. 93 (Bankr. S.D.N.Y. 1998).

Courts apply the factors set forth in *Lar Dan* to determine whether compensation to debtor's

counsel from a third party is an impermissible conflict of interest. *See id.* at 96. The *Lar Dan*

factors include whether: (1) the arrangement is fully disclosed to the debtor and the third party

payor; (2) the debtor expressly consented to the arrangement; (3) the third party payor retained

independent legal counsel and understands that the attorney's duty of undivided loyalty is owed

exclusively to the debtor; (4) the factual and legal relationship among the third party payor, the

debtor, the respective attorneys, and their contractual arrangement concerning the fees, is fully

disclosed to the court at the outset of the debtor's bankruptcy representation; and (5) the debtor's

attorney can demonstrate the absence of facts which otherwise create non-disinterestedness,

---

[8]     Even if the Agreement were subject to Section 364 of the Bankruptcy Code, BMG would lack standing to
object because it is not a creditor in this bankruptcy case. *See* Reply ¶ 1. BMG argues standing is broadly defined
and being that it would be impacted by the Agreement, it has the right to object. *See* Hr'g Tr. 33:24–25. It also
argues that since it owes contempt sanctions to Mr. Burgio, the rights to which have been transferred to the Debtor,
it is now a creditor of the Debtor. *See* Hr'g Tr. 33:13–16. But under the Bankruptcy Code a claim is defined as a
right to payment. *See* 11 U.S.C. § 101(5). Here, BMG has no right to payment from the Debtor but rather, it owes
money to the Debtor.

actual conflict, or impermissible potential for a conflict of interest.  *Id.*  The Court concludes that these factors are satisfied in this case.  The arrangement has been fully disclosed between the parties, the Debtor consents, the Landlord has its own legal counsel and understands that the Debtor retains control of the case, the terms of the Agreement were fully disclosed to all parties on notice and a hearing before the Court and no party, other than BMG, has objected, and the Debtor has demonstrated there will be no conflict of interest.[9]

Finally, BMG complains that if the Debtor succeeds on the Surrender Motion then the Lease will be turned over to the Landlord in what essentially amounts to a private sale.  *See* Objection ¶ 4.  BMG's argument is at odds, however, with the fact that the Lease was not subject to a public auction when it was assigned to BMG nearly three years ago.  Nevertheless, the certainty of $1,000,000 for the Lease would support a private sale to the Landlord, given the uncertainty and further delay that would result from a public auction and the years that the Debtor has been searching for a way to fund an exit from bankruptcy.  *See In re MF Glob. Inc.*, 535 B.R. 596, 605–06, 608 (Bankr. S.D.N.Y. 2015) (approving sale agreement where property would be sold pursuant to a private sale).  In the interest of time, the Court will not address the remaining objections of BMG, but overrules any objections not already discussed herein.

---

[9]        In fact, BMG's counsel is no stranger to these types of third party payor arrangements.  In *In re Ancona*, 2016 WL 7868696 (Bankr. S.D.N.Y. Nov. 30, 2016), the court expressed concerns regarding a third party fee payment application sought by the debtor's bankruptcy counsel—the same counsel that BMG has in this case.  *See id.* at *11.  Under the application, the debtor sought approval to have his legal fees paid through a company in which he had a 95% interest, which would be borrowing the funds from an undisclosed third party.  *See id.* at *11 n.11.  The court denied the application.  *See id.* at 11.  The debtor made a second application, under which the debtor sought to have his father pay the legal fees of special counsel.  *See id.* at *12.  The court denied this application as well, "due to the lack of disinterestedness and the apparent conflicts of interest" along with "the lack of candor and transparency in connection with the application."  *Id.*  Unlike *Ancona*, the identity of the third party payor—the Landlord—is fully disclosed.  Furthermore, the Landlord is not an insider and the terms of the arrangement have been fully disclosed to the Court and all parties in interest.

## <u>CONCLUSION</u>

For all the reasons set forth above, the Court approves the Motion.  The Debtor shall submit a proposed order on three days' notice.  The proposed order shall reflect the modifications to the Agreement that were discussed at the July 11th Hearing to clarify the Court's questions relating to the Debtor's ability to reach a settlement with BMG and/or BMG's principals without the Landlord's consent.[10]

Dated: New York, New York
      August 4, 2017

                               /s/ *Sean H. Lane*_____
                               UNITED STATES BANKRUPTCY JUDGE

---

[10] At a hearing in the BMG bankruptcy case held on August 2, 2017, that was also attended by counsel to this Debtor, the Court briefly discussed the status of the motions that were *sub judice* in these cases.  These matters include the Motion that is the subject of this ruling and the Debtor's Surrender Motion.  The Court hereby schedules the Surrender Motion for a further hearing on August 22, 2017, at 2:00 pm.  At that time, the Court will consider the impact, if any, on the Surrender Motion from the BMG bankruptcy and BMG's motion to purge contempt.  *See* March 2017 Contempt Order ¶ 6.